Matthew Clarke, State Bar No. 184959
(matt@christmankelley.com)
Dugan P. Kelley, State Bar No. 207347
(dugan@christmankelley.com)
Matthew N. Mong, State Bar No. 273337
(mmong@christmankelley.com)
CHRISTMAN, KELLEY & CLARKE, PC
1334 Anacapa Street
Santa Barbara, CA 93101
Tel.: (805) 884-9922
Facsimile: (866) 611-9852

Attorneys for Intervenor SAVE THE VALLEY, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ROMAN CATHOLIC BISHOP OF MONTEREY,<br><br>              Plaintiff,<br><br>vs.<br><br>SALOMON COTA, et al.,<br><br>              Defendants. | Case No.: 2:15-cv-08065 JFW (RAOx)<br><br>**NOTICE OF MOTION AND MOTION FOR ORDER ALLOWING LEAVE TO FILE COMPLAINT IN INTERVENTION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**[Filed and served concurrently with: (1) request for judicial notice; and (2) declaration of Steve Pappas.]**<br><br>Date:    December 14, 2015<br>Time:    1:30 p.m.<br>Courtroom:  16<br><br>The Honorable John F. Walter |

SAVE THE VALLEY'S MOTION FOR LEAVE TO FILE COMPLAINT IN INTERVENTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on December 14, 2015, at 1:30 p.m., or as soon thereafter as the matter may be heard, in the above-entitled Courtroom 16 of the Federal District Court for the Central District of California, located at the Spring Street Courthouse, 312 N. Spring Street, Los Angeles, California, before the Honorable John F. Walter, United States District Judge.

SAVE THE VALLEY, LLC will move the Court for an order allowing it to file a complaint in intervention in this action pursuant to FRCP 24(a) and alternatively FRCP 24(b), which allow a party to intervene either as a matter of right or permissively upon timely motion.  A true and correct copy of Save the Valley, LLC's [Proposed] Complaint in Intervention is attached as **Exhibit X** to the Declaration of Steve Pappas concurrently filed herewith.

The motion is based on this notice, the memorandum of points and authorities filed herewith, the declaration of Steve Pappas, the records and pleadings on file herein, and on such other evidence as may be presented.

DATED: November 13, 2015          CHRISTMAN, KELLEY & CLARKE, PC



By:  /s/ Matthew M. Clarke
     Matthew M. Clarke
     Dugan P. Kelley
     Matthew N. Mong
     Attorneys for Intervenor SAVE THE
     VALLEY, LLC

SAVE THE VALLEY'S MOTION FOR LEAVE TO FILE COMPLAINT IN INTERVENTION

# **TABLE OF CONTENTS**

TABLE OF CONTENTS................................................................................i

TABLE OF AUTHORITIES .......................................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

    I.   INTRODUCTION ................................................................................1

    II.  STATEMENT OF FACTS.................................................................1

        A.   Events Occurring Prior to Entry of Judgment in this Action.............2

            1.   The Catholic Church Acquires a Large Tract of Land Called "Canada de los Pinos" from the Mexican Governor of California in 1844 ............................................2

            2.   The 1891 Mission Indian Relief Act and the Smiley Commission Report does not Transfer any Land to the Band...................................................................2

            3.   The Recommendation of the Smiley Commission is Carried Out by an Indenture Recorded on May 2, 1903 between the Santa Ynez Land and Improvement Company and the Secretary of the Interior of the United States of America ........................................4

        B.   The Judgment is Entered in this Action ...........................................5

        C.   Events Occurring Post Entry of Judgment.........................................9

            1.   The 1906 Agreement between the Catholic Church and the United States........................................................9

            2.   The 1933 John Dady Letter to Congressman Henry E. Stubbs ...................................................................9

            3.   The 1934 John Dady Telegram.................................10

            4.   The Catholic Church Transfers the Reversionary Interest in the Property to the United States by Quitclaim Deed in 1935.........................................10

            5.   The 1941 John Dady Letter to Indian Affairs..........11

            6.   The Chicago Title Company Determines that the Land is Held in Fee by the United States of America and is not a Federal Indian Reservation in 1999...........................12

            7.   The Official Records of the County of Santa Barbara Assessor's Office Show that the Property is Owned in Fee by the United States of America in 2014.....................12

D.   The Band' Commercial Use of Massive Amounts of Water is just One Violation of the Judgment ................................................ 13

III.   ARGUMENT ........................................................................................ 14

A.   Federal Rules of Civil Procedure Rule 24 Allows Save the Valley to Intervene.......................................................................... 14

B.   Save the Valley's Motion to Intervene is Timely under the Unusual Circumstances of this Case............................................... 15
   1.   Case Law Allows Post-Judgment Intervention ..................... 15

   2.   The Facts of this Case Dictate that Save the Valley, LLC's Motion to Intervene Could not have been Brought Sooner................................................................... 16

C.   Save the Valley has a Direct and Immediate Interest in this Action........................................................................................... 17

D.   The Intervention will not Enlarge the Issues in this Litigation ....... 19

E.   The Reasons for the Intervention Outweigh any Opposition by the Parties Presently in this Action............................................... 20

IV.   CONCLUSION.................................................................................... 20

SAVE THE VALLEY'S MOTION FOR LEAVE TO FILE COMPLAINT IN INTERVENTION

1

## **TABLE OF AUTHORITIES**

**Cases**

*Brink v. DaLesio*
  (4th Cir. 1981) 667 F.2d 420 ................................................................ 15

*Dow Jones & Co., Inc. v. U.S. Dept. of Justice*
  (S.D.N.Y. 1995) 161 F.R.D. 247 ........................................................ 15

*Jones v. Prince George's County, Maryland*
  (D.C. Cir. 2003) 348 F.3d 1014 .......................................................... 17

*Mallick v. Superior Court*
  (1979) 89 Cal.App.3d 434 .................................................................... 16

*NAACP v. New York*
  (1973) 413 U.S. 345 ............................................................................. 15

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*
  (7th Cir. 1996) 101 F.3d 503 .............................................................. 17

*U.S. v. American Tel. and Tel. Co.*
  (D.C. Cir. 1980) 642 F.2d 1285 .......................................................... 15

*Winters v. United States*
  (1908) 207 U.S. 564 ............................................................................. 13

**Rules**

Fed. R. Civ. Proc. 24(a) ......................................................................... 14

Fed. R. Civ. Proc. 24(a)(2) .................................................................... 14

Fed. R. Civ. Proc. 24(b) .................................................................... 1, 14

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SAVE THE VALLEY'S MOTION FOR LEAVE TO FILE COMPLAINT IN INTERVENTION

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The instant case and this motion to intervene concern 75 ¾ acres of land on the east side of Zanja de Cota Creek in Santa Ynez, California (the "Property").  This is where the Santa Ynez Band of Mission Indians (the "Band") are currently constructing a high rise hotel and parking structure to greatly support and expand their existing gambling operations in direct violation of Santa Barbara County safety regulations and ordinances.  In 1906, the Santa Barbara Superior Court entered a valid Judgment (the "Judgment") which restricts the Band's use of the Property to "occupancy only" and additionally restricts the Band to "only so much of the waters from Zanja Cota Creek that is now and may from time to time be needed for domestic use," i.e., non-commercial use.  (*See* Exhibit A-2 [Transcription of the Judgment, 27:25-28:7].)  The Judgment made it clear that the Band had neither right to the title of the Property nor any right of ownership to the waters of Zanja Cota Creek.

After entry and recording of the Judgment against the Band "known as the band or village of Santa Ynez Indians," Plaintiff, the Catholic Church, transferred to the Band the right of occupancy only with a complete reversionary interest if the Band ceased to exist or vacated the Property.  Thereafter, the Catholic Church transferred its reversionary interest to the United States of America.  There is no event or document in the historical record reversing, modifying, releasing or otherwise altering the restrictions in the Judgment.  It is in full force and effect.  Yet, with regard to their current hotel tower and casino expansion, the Band treats the Property as if the Judgment does not exist.  Based on the foregoing, it is essential for this Court to enforce the Judgment.  For these reasons, the Court should grant this motion and allow Intervenor Save the Valley, LLC to file the attached complaint in intervention.

## II.   STATEMENT OF FACTS

To understand why intervention should be allowed in this case, it is important to understand the events occurring both before and after the Court entered Judgment

1

SAVE THE VALLEY'S MOTION FOR LEAVE TO FILE COMPLAINT IN INTERVENTION

in this case.  The following paragraphs will discuss those events.

    **A.**    **Events Occurring Prior to Entry of Judgment in this Action**

        **1.**  **The Catholic Church Acquires a Large Tract of Land Called "Canada de los Pinos" from the Mexican Governor of California in 1844**

The Roman Catholic Church acquired the Canada de Los Pinos land grant from the Mexican Governor of California in 1844.  The Mexican Land Patent was reaffirmed by the United States Land Commission on February 28, 1861 by the issuance of a federal patent to the Catholic Church by this Commission. (*See* Exhibit A-1.)  This information is relevant because the Property specified in the Judgment lies within this Canada de Los Pinos Land Grant.

        **2.**  **The 1891 Mission Indian Relief Act and the Smiley Commission Report does not Transfer any Land to the Band**

On January 12, 1891, the United States Congress passed the Mission Indian Relief Act.  (*See* Exhibit B.)  The Act created a commission to carry out the Act's mandate.  Section 2 of the Act provides:

> It shall be the duty of said Commission to select a reservation for each band or village of the Mission Indians residing within said State, which reservation shall include, as far as practicable, the lands and villages which have been in actual occupation and possession of said Indians, which shall be sufficient in extent to meet their requirements, which selection shall be valid when approved by the President and Secretary of the Interior.

The findings of the Mission Indian Commission were published in a report that was approved by executive order of President Ben Harrison on December 29, 1891.  This report was known as the "Smiley Commission Report."  (*See* Exhibits C, D.) Although specific lands for reservations were "set aside" for many Mission Indian Groups, such as San Manuel, Twenty-Nine Palms, Ramona, Pala, no land was set aside to create a federal reservation for the Santa Ynez Band. (*See* Exhibit C, pp. 26-28.)

    The Smiley Commission Report concluded that the present owners of the

1   Canada Los Pinos Land Grant (the "Grant") offered to allow the Band to continue to

2   occupy the land and would deed to the Secretary of the Interior five acre parcels each

3   for several families:

> The present owner of the grant, while maintaining that the Indians had no legal rights which they will recognize, emphatically declares that they will protect and maintain, to the fullest extent their equitable rights. They declare these Indians shall never be disturbed in their occupancy and use the lands on which they now live, if they persist in their wish to stay where they are; or they will, preferably, deed to the Secretary of the Interior, in trust for them, five acres of good land, to each family; pipe to it sufficiency of water for agricultural and domestic purposes, and build for each family a comfortable two room frame house.

9   The Commission believed that five acre parcels for each of the families was an

10  adequate solution, given the Commission's decision that the Band did not qualify for a

11  federal reservation. The Commission noted:

> Having no power either to set apart the lands now occupied or to compel the Indians to accept the offer made by the Company, feel that they have discharged their duty in the premises when they recommend, as they do, that the special attorney for the Mission Indians be instructed to take immediate steps to perfect the arrangement proposed by The Company, fearing a change in its control might jeopardize the liberal offer now made.

16  The "Company" referred to above is the Santa Ynez Land and Improvement

17  Company, which, on August 6, 1887, obtained several hundred acres of land from

18  Harry L. Willey.  (*See* Exhibit E.)  Mr. Willey's lands were formerly part the Los

19  Pinos grant owned by the Catholic Church.  Part of the land that the Santa Ynez Land

20  and Improvement Company obtained was approximately 25 acres "lying <u>west</u> of the

21  Zanja de Cota Creek" and was the 25 acres at issue in the May 2, 1903 indenture

22  discussed below.   (*See* Exhibit E [emphasis added].)

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

SAVE THE VALLEY'S MOTION FOR LEAVE TO FILE COMPLAINT IN INTERVENTION

### 3. The Recommendation of the Smiley Commission is Carried Out by an Indenture Recorded on May 2, 1903 between the Santa Ynez Land and Improvement Company and the Secretary of the Interior of the United States of America

On May 2, 1903, an indenture between the Santa Ynez Land and Improvement Company and Secretary of the Interior of the United States was recorded.  (*See* Exhibit F).  This indenture reaffirmed verbatim the previous agreement made between The Santa Ynez Land and Improvement Company and Lucias Wright, Agent for the United States.  The previous agreement was entered into on November 27, 1901.  (*Id.*)  This previous 1901 agreement is referred to in the opening section of the May 2, 1903 indenture. (*Id.*)

This 1903 indenture provided for two tracts of land divided into 5-acre land allotments for each of the five "separate" families living on the western bank of the Zanja Cota Creek, for a total of 25 acres.  (*See* Exhibits G-1, G-2.)  The indenture was encumbered with restrictions and a reversionary clause.  The Band was allowed to live on the property and had the right to use water for domestic use only.  All surplus water rights were reserved by the transferor, the Santa Ynez Land and Improvement Company.  This indenture was endorsed by the Secretary of the Interior who accepted the "grant in trust" on behalf of the five individual families.  The exact language of the Secretary of the Interior which is in the last paragraph of the 1903 agreement was: "I do accept the trusts as enumerated and set out in the above contract, upon the terms, conditions and stipulations, as in said contract contained."  (Exhibit F.)

Importantly, these 5 acre allotments were all on the western bank of the Zanja de Cota Creek.  The current hotel and casino expansion is located on the east side of the Zanja de Cota Creek.  The Property on the east side of the creek is subject to the Catholic Church's litigation and the Judgment entered in this case.  The east side of the creek is also where the Band is expanding their casino and building a 12 story high-rise hotel tower and a large parking structure in direct violation of Santa Barbara

County safety regulations and ordinances.

    **B.**    **The Judgment is Entered in this Action**

On January 18, 1897, the Catholic Church filed this lawsuit (now in federal court) to quiet title to its Property.  The Defendants were the Band of Santa Ynez Indians, who were recent converts to the Catholic faith.  The Catholic Church had allowed the Band to occupy "only" certain portions of the Church's land, as well as domestic use of the water of Zanja Cota Creek for the"[w]atering of stock and for purposes of irrigation of said parcel or tract of land but for no other purposes."  The Band was restricted to a right of occupancy only of the Property, also known as a possessory interest.  As a result of subsequent events described below, the United States eventually became the title owner of the Property, but the Band never gained additional property rights and the Property was never taken into trust by the Secretary of the Interior for the Santa Ynez Band of Mission Indians.

The Catholic Church sought to quiet title and impose those restrictions on the Property that the Band occupied.  The Property involved in the quiet title action brought by the Catholic Church includes the same land on which the Band is building their current project – a 12 story high-rise casino and hotel expansion.

The Catholic Church sued a large number of individuals who the court declared were the Santa Ynez Band of (Mission) Indians as well as Lucius A. Wright, whom the Court identified in its Statement of Decision as having Presidential and Congressional authority of an Indian Agent and the authority to bind the Band and the United States:

> XVIII. That Lucius A. Wright is the Agent of the United States for the Indians of the Mission Tule River Agency in California duly appointed to be such agent by the President by and with the advice and consent of the Senate of United States and charged by Section 2058 of the Revised Statutes of the United States with the duty within his agency of managing and superintending the intercourse with the Indians according to law and of executing and performing such duties as may be prescribed by the Commissioner of the United States of Indians Affairs.

The "Revised Statutes of the United States" cited in the 1906 Statement of

5

Decision was the first official codification of the Acts of Congress and the precursor to the United States Code.  Section 2058 provided that:  "Each Indian agent, shall, within this agency, manage and superintend the intercourse with the Indians, agreeable to law, and execute and perform such regulations and duties as may be prescribed by the President, the Secretary of the Interior, or the Commissioner of Indian Affairs."

The Court noted the appearances of the parties in its Statement of Decision, at page 2:1 through 4:8, where the Court wrote:

> The Clerk of this Court having duly entered in the above-entitled action the defaults of the above-named defendants *[names omitted]* … and the issues arising upon the amended and supplemental complaint of the above-named plaintiff The Roman Catholic Bishop of Monterey and the answer thereto of the above-named defendants *[individual names omitted]*…

> … and Lucius A. Wright as Agent of the United States for the Indians of the Mission Tule River Agency in California … having been duly brought on for trial and tried by the Court on the 19th and 20th days of December, 1905, trial by Jury having been waived by the several parties to said issues with the assent of the Court by oral consent in open Court entered in the minutes, and said plaintiff appearing by its Counsel Henry P. Starbuck, Esq., …

> … and said answering defendants except said defendant Juan Cota appearing by their counsel William Collier, Esq., and said defendant Juan Cota appearing by his Counsel Benjamin F. Thomas, Esq.,…

> … plaintiff having thereupon applied to the Court for the relief demanded in said complaint and the allegations of said plaintiff and of said answering of defendants and the legal evidence offered by said plaintiff and by said answering defendants having been duly heard and considered and the agreement mentioned in said answer of said answering of defendants …

> … including the stipulation in said agreement contained for judgment herein having been presented to the Court and duly considered and this decision being given pursuant to the consent and with the consent of the parties to said agreement and stipulation in the course of the fulfillment and in full and complete performance thereof on the part of said parties thereto …

> … the Court now gives its decision in writing and as required by Section 633 of the Code of Civil Procedure separately states the facts found and the conclusions of law as follows […]  (Exhibit A-1.)

SAVE THE VALLEY'S MOTION FOR LEAVE TO FILE COMPLAINT IN INTERVENTION

The statement of decision was merged into a March 31, 1906 Judgment, a transcription of which is attached hereto as Exhibit A-3.  No party appealed the Judgment which remains in force to this day.

The Judgment includes metes and bounds which describe the Property.  This is the same Property where the Band is expanding their casino and resort operation.  The Judgment was recorded in the Santa Barbara County Recorder's Office, quieting title to that Property.

The Property subject to the Judgment is on the <u>east side</u> of Zanja de Cota Creek, aka, Cota Creek:

> That said portion of said first above described of said two parcels of land so continuously and generally occupied in common by said band or village as aforesaid lies in a Southwesterly direction from the village of Santa Ynez <u>near the east bank of said Zanja de Cota</u> or Cota Creek but not bordering thereon or bounded thereby or riparian thereto and contains about seventy-five and three-quarters acres of land and the said continuous, general and common occupancy and right of occupancy thereof by said band or village . . . .  (Exhibit A-2, p. 12:7-16 [emphasis added].)

The Property described in the Judgment is the 75 ¾ acres "<u>east</u>" of the Zanja de Cota Creek  which is depicted in Blake Land Surveys' Plats generated against Survey No. 9 Map, surveyed by Frank F. Flournoy County Surveyor in June 1899 and filed in the office of the Recorder of The County of Santa Barbara.  (*See* Exhibits G-1, G-2.)  The Judgment, which was recorded on June 18, 1906, references a map attached as Exhibit G-2 which depicts the Property subject to the terms of the Judgment.

The Judgment and subsequent recording notified all concerned that the parcel was exclusively owned by the Catholic Church.  The Judgment actually binds the entire 11,500 acre portion of the Canada de los Pinos land grant, all of which the Superior Court found was owned in fee simple by the Catholic Church.  (*See* Exhibit A-2, p. 4:18-22, ¶ II.)  The Judgment limited the Band to a right of <u>occupancy</u> and the right to use the water "for domestic use and for the watering of stock and for purposes of irrigation …."  (Exhibit A-2, p. 28:4-7.)  The Band became subject to the Judgment which "perpetually and forever" enjoined, restrained and debarred the Band from

7

"asserting in any way any claim" whatever to the Property, "or any part thereof, or in or to the water of Zanja Cota Creek of Cota Creek or to or any part thereof."  (Exhibit A-2, p. 31:22-33:7.)

The United States Department of Interior Bureau of Indian Affairs Pacific Regional Office has approved the Tribe's proposed Land Consolidation & Acquisition Plan, mistakenly believing that the Band have a legitimate right to make an aboriginal claim to Property, which is contrary to the 1906 Judgment.  (*See* Exhibit K.)  This Land and Consolidation Plan is also known as the Tribal Consolidation Area ("TCA").

The current Band are descendants of the Band subject to the Judgment.  This is clearly exemplified with Vince Armenta, the Chairman of the Santa Ynez Band of Mission Indians whose grandmother, Florencia Pascuala Pina – a defendant named in the 1906 Judgment – is identified as a ¼ degree of Indian blood on the Indian Census Rolls dating back to 1931 and 1932.  (*See* Exhibit U, pp. 1-2.)

The Judgment leaves no doubt that the Band are prohibited from claiming  any aboriginal right, title or interest in the Property – not in the past, not in the present, and not in the future  There is no factual or legal reason why the Judgment is now invalid.  These restrictions directly impacted, adjudicated, and decreed that the Band, and any descendant who might occupy the Property in the future, were forever barred and enjoined from claiming any right, title and interest in the Property beyond the right of occupancy.  This is contrary to the Band building a 12 story casino and hotel expansion on the Property that they do not own but have only the right to occupy.

The United States of America by Mr. Wright submitted to the jurisdiction of the Santa Barbara County Superior Court and was bound by all the covenants, terms, conditions and restrictions placed on the Property, including those which were to run with the land and be binding upon any and all assigns and successors in interest of the owners holding legal title to the Property in the future, including the United States of America. The Judgment was not appealed nor was it later vacated or modified in any

1  way.  It is still legally enforceable today but it is not being enforced.

2      C.     **Events Occurring Post Entry of Judgment**

3          **1. The 1906 Agreement between the Catholic Church and the**

4              **United States**

5          Shortly after entry of Judgment, the Catholic Church drew up an agreement

6  with the United States.  The April 10, 1906 agreement was recorded <u>June 18, 1906</u>

7  and vested title to the Property on the <u>east side</u> of Zanja de Cota Creek to the United

8  States, subject to the encumbrances of the recently entered Judgment.  The April 10,

9  1906 agreement carefully confirms that the Band may only <u>occupy the property</u> and

10 may use the water for domestic use only.  Occupancy rather than ownership by the

11 Band is consistent with the Judgment.  The use of water on the Property was restricted

12 in quantity to domestic use and irrigation on the Property, "to and in so much of the

13 waters of Zanja Cota Creek as by the members of said band or village of Mission

14 Indians known as Santa Ynez Indians and may be needed for domestic use and for the

15 watering of stock . . . ." (Exhibit H.)  Pursuant to the 1906 agreement, the United

16 States would hold conditional title to the Property so long as the Band or their

17 descendants were alive and occupied the Property continuously.  If the Band ceased to

18 exist or ceased to occupy the Property, the Property would automatically revert back

19 to the Catholic Church.

20          **2. The 1933 John Dady Letter to Congressman Henry E. Stubbs**

21         John Dady, Superintendent of Indians for the Mission Indian Agency,

22 Riverside, California, wrote a revealing letter to Congressman Henry E. Stubbs,

23 Member of the House of Representatives from the tenth congressional district of

24 California on November 27, 1933.  (Exhibit L.)  Mr. Dady wrote that the "reservation"

25 comprises 75.75 acres, "and while it is a reservation, the title to the land is not in the

26 United States.  The Band reside on it and have use and occupancy only."  Mr. Dady

27 then describes how the Catholic Church obtained the property and made an agreement

28 with the United States allowing the Band to occupy the Property, "and this agreement

is binding on later purchasers."  Mr. Dady states, "these Indians are all of Shoshonean origin, with an admixture of Spanish . . . .  [T]he truth of the matter is, they resent being classed as Indians . . . nor do they desire to be so called."  What Mr. Dady described was the inalienable right to occupy the Property and use the water for domestic purposes as clearly reflected in the 1906 agreement and consistent with the restrictions of the Judgment.

### 3.  The 1934 John Dady Telegram

On March 28, 1934, John Dady, again in his capacity of Superintendent of Indians for the Mission Indian Agency, Riverside, California, sent a telegram to the Indian Office in Washington, D.C. providing a status report on the Santa Ynez "reservation" property.  Mr. Dady indicated in his telegram:  "Title to land of Santa Ynez Reservation is neither in the United States or the Indians who have right of occupancy only from the Catholic Church . . . ."  (Exhibit M.)  Mr. Dady goes on to request approval of a work program for the Band.  (*Id.*)  Importantly, the Dady telegram confirms the status of the Property outlined above – the Band had a right of occupancy only, even as late as 1934 but there is no federal Indian reservation.

### 4.  The Catholic Church Transfers the Reversionary Interest in the Property to the United States by Quitclaim Deed in 1935

On October 14, 1935, the Catholic Church executed a quitclaim deed in favor of the Secretary of the Interior of the United State of America.  The quitclaim deed was recorded on December 23, 1938.  The essential function of the quitclaim deed was to "[convey] to the Secretary the 75 ¾ acres, in fee, that the Bishop held [a] reversionary interest in."  (Exhibit I.)

Similarly, on October 31, 1935, Petroleum Securities Company who was a successor in interest executed a quitclaim deed in favor of the Secretary of the Interior of the United States of America.  This deed was recorded on December 23, 1938 and conveyed a "to the Secretary the reversionary interest in the 75 ¾ acres acquired by the Grantor (Petroleum Securities Company) from the Catholic Church."  (Exhibit J.)

The result of the two quitclaim deeds was to transfer the reversionary interest held by the Catholic Church to the United States.  Thus, the Band continued to have a possessory right and a right to use water occurring on the Property for domestic use. If the Band ceased to exist or ceased to occupy the Property, the right to occupy the Property and the right to use water immediately ceased.  After October 1935, full ownership rights would revert back to the Secretary of the Interior of the United States of America.  Furthermore, the Judgment discussed above is still in place and restricts the Band' rights consistent with the 1906 Agreement.  It should also be noted that the Quitclaim deeds gave the United States title to the Property to establish a non-federal reservation for the "occupancy and use only" of the Band.  Neither the Catholic Church nor its successor in interest, the Petroleum Securities Company, had any authority to establish a "federal" Indian Reservation nor to direct the United States to take the land "into Trust for the Santa Ynez Band".  Anecdotally labeling the land as a "reservation" is insufficient to make a Federal Indian reservation.  According to the Bureau of Indian Affairs, a <u>federal </u>Indian reservation is an area of land reserved for a tribe or tribes under treaty or other agreement with the United States, executive order, or federal statute or administrative action as permanent tribal homelands, <u>and where the federal government holds title to the land in trust</u> for the tribe."[1]The 75 ¾ acres was not taken into Trust by the United States for the Santa Ynez Band of Mission Indians as a result of these quitclaims.

### 5.  The 1941 John Dady Letter to Indian Affairs

By 1941, there is still no federal Indian reservation established out of the Property to the <u>east</u> of the Zanja de Cota Creek.  On November 7, 1941, Mr. Dady again confirms that the Band were granted possessory rights to the Property.  (*See* Exhibit N.)  By 1941, Mr. Dady was still trying to convince the Commissioner of Indian Affairs ("The Department") to officially accept the Catholic Church's

---

[1] http://www.bia.gov/FAQs/ (emphasis added).

SAVE THE VALLEY'S MOTION FOR LEAVE TO FILE COMPLAINT IN INTERVENTION

conveyance of those possessory and water rights.

### 6.  The Chicago Title Company Determines that the Land is Held in Fee by the United States of America and is not a Federal Indian Reservation in 1999

On July 7, 1999, the Chicago Title Company issued a preliminary ALTA title report, which is addressed to the Band' "Chairman." (Exhibit O.)  The report indicates that Parcel One is the exact same property that the Indian's current hotel tower, parking structure and casino expansion are being built on and is held by the United States of America "in fee." (Exhibit O, p. 2.)  The Chicago Title report identifies encumbrances on the Fee interest in Schedule B.  Schedule B identifies and refers to both the June 9, 1903 and the June 18, 1906 Agreements allowing the Band to occupancy only of the Property and restricting them to a limited amount of water for domestic uses only.  Many additional exceptions follow in the report.  However, none of the exceptions indicate that any portion of the Property examined is held by the United States of America in trust for the Band.

### 7.  The Official Records of the County of Santa Barbara Assessor's Office Show that the Property is Owned in Fee by the United States of America in 2014

Even quite recently, in 2014, the official records of the County of Santa Barbara show that the Property located at 3410 E. Highway 246, Santa Ynez, California is owned by the "United States" but there is no indication that the property is held in trust for the Band.  (*See* Exhibit P.)  This indication is identified for APN #141-450-005 which is located at 3410 E. Highway 246.  This is the same address where the Band are building the 12 story hotel tower and parking structure to support their expanding gambling operation.

The United States has taken some land in Santa Ynez into trust for the Band. The records of Santa Barbara County accurately reflect that 11.67 acres of property on Calzada Avenue in Santa Ynez, California is held in trust by the United States for the

1   Band.  This is APN# 141-450-006.  Official Santa Barbara County records state the

2   owner is the "<u>United States of American in Trust for the Santa Ynez Band of Mission</u>

3   <u>Indians</u>."  The Band applied for and were granted, by the Bureau of Indian Affairs, a

4   "Fee-to-Trust" conversion in 2004 for this 11.67 acre parcel. (*See* Exhibit P, p. 2.)

5   The Court should note that the mailing address for the 11.67 acre parcel held in trust is

6   2800 Cottage Way, Sacramento, California, 95825.  This location is an office of the

7   United States Department of the Interior, Pacific Region Bureau of Indian Affairs,

8   which is the agency that governs federal Indian reservations and in the case of this

9   parcel, federal trust lands.

10  **D.    The Band' Commercial Use of Massive Amounts of Water is just**

11  **One Violation of the Judgment**

12         Despite the Judgement, the Band claim the Property is held for them in trust as

13  a federal Indian reservation and they may do what they wish with the Property.  The

14  Band already use 22,600 gallons of water per day or 25 Acre Feet per Year ("AFY")

15  to support their casino operation.  (Exhibit R, p. 3.2-9.)  With the casino expansion

16  and hotel tower, the Band plan on pumping up to 310 gallons per minute (310 gpm)

17  out of various wells on the property to meet the expected 40 AFY of water they will

18  use in addition to the 25 Acre Feet per Year of existing consumption.  (Exhibit R, p.

19  3.2-11.)  The fact is that none of this water will be used for "domestic" purposes and

20  none of it will be used for agricultural or livestock purposes.  All of this water will be

21  used for the Band's commercial operations including the casino, the hotel resort, and

22  the associated uses.  This use of water is a complete abomination of the restrictions in

23  the Judgment.

24         The Band even more blatantly claim they have "*Winters* Rights" to the Zanja

25  Cota Creek  as well as to the stream underflow (e.g., within alluvial deposits).  (*See*

26  Exhibit R, pp. 4-1.)  To Save The Valley's knowledge, this is the first time the Tribe

27  has ever made this claim.  *Winters* Rights refers to *Winters v. United States* (1908)

28  *207 U.S. 564*, which held that the creation of a Federal Indian reservation implies that

Federal Reserve priority water rights for the Band go along with the land.  The Santa Ynez Band  claim of *Winters* Rights is another reason to allow Save the Valley leave to intervene to enforce the Judgment which enjoined, restrained and debarred the Band from making or asserting in any way any claim whatever to or in the water of Zanja Cota Creek.  (*See* Exhibit A-2, pp. 31:22-33:7.)

## III.   ARGUMENT

### A.   Federal Rules of Civil Procedure Rule 24 Allows Save the Valley to Intervene

Federal Rules of Civil Procedure 24(a) provides for intervention as of right, as follows: "On timely motion, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  Additionally, subparagraph (b) provides for permissive intervention: "On timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact.  Under permissive intervention, the Court, in exercising its discretion, "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."

Here, Save the Valley first seeks intervention of right under FRCP 24(a)(2). Secondarily, Save the Valley, LLC seeks permissive intervention under FRCP 24(b). Save the Valley, LLC's interest is in preserving the rural composition of the Santa Ynez Valley and preserving the limited natural resources available to the Santa Ynez Valley.  The rural nature of the valley is what contributes in large part to favorable property values of property owned by Save the Valley, LLC constituents and supporters.  Furthermore, the Santa Ynez Valley is currently in a "Stage 2 Critical

SAVE THE VALLEY'S MOTION FOR LEAVE TO FILE COMPLAINT IN INTERVENTION

Water Supply Shortage Emergency". Governor Brown issued Executive Order B-29-15 on April 1st, 2015, calling for State-wide "mandatory" water use reductions. The Judgment in this case restricted the use of the 75 ¾ property to "occupancy" by the Santa Ynez Band and restricted the Band's right to use water to "domestic" purposes only.

The Santa Ynez Band's current hotel and casino expansion violates the Judgment. Allowing the Santa Ynez Band to continue violating the Judgment will impair or impede Save the Valley, LLC's ability to protect its interest. No existing party to this case will enforce the Judgment. Intervention into this action is necessary to protect Save the Valley, LLC's interests.

**B.    Save the Valley's Motion to Intervene is Timely under the Unusual Circumstances of this Case**

**1.    Case Law Allows Post-Judgment Intervention**

Federal case law and even the United States Supreme Court allow a party to intervene after judgment is entered (although post-judgment intervention is clearly not the favored method). "Timeliness is to be determined from all the circumstances." (*NAACP v. New York* (1973) 413 U.S. 345, 366.) Of particular importance is the time elapsed since the inception of the suit, the purpose of the intervention, the degree to which intervention is necessary to preserve the applicant's rights, and the probability of prejudice from the intervention to those already parties. (*U.S. v. American Tel. and Tel. Co. (D.C. Cir. 1980) 642 F.2d 1285, 1295*; *see also Brink v. DaLesio* (4th Cir. 1981) 667 F.2d 420, 428-429 [allowing post-judgment intervention when "the lateness of [movant's] application is completely explainable"].)

The analysis is whether the motion is untimely based upon <u>all</u> of the circumstances. Leave to intervene may be granted at any time – even after judgment has been rendered – if the Court finds the application was "timely" under the circumstances, and intervention is otherwise appropriate. The Court in *Dow Jones & Co., Inc. v. U.S. Dept. of Justice* (S.D.N.Y. 1995) 161 F.R.D. 247, 251, discussed the

SAVE THE VALLEY'S MOTION FOR LEAVE TO FILE COMPLAINT IN INTERVENTION

cases concerning post-judgment intervention and allowed a post-judgment intervention.  (*See Mallick v. Superior Court* (1979) 89 Cal.App.3d 434, 437 [member of class was allowed to intervene in class action after judgment, in order to replace class representative.].)

## 2.   The Facts of this Case Dictate that Save the Valley, LLC's Motion to Intervene Could not have been Brought Sooner

This is not a case in which Save the Valley has known about the Judgment for many years.  Rather, Save the Valley, LLC learned of the Judgment in connection with two critical events, both occurring in 2014.  Those two events have made the long-dormant Judgment highly relevant.

The Santa Ynez Band had previously constructed their existing casino and small hotel in 2004.  However, the Band sourced its water for the casino and hotel from the County of Santa Barbara, Santa Ynez River Water Conservation District, not from the property, nor directly from the Zanja Cota Creek.  The Santa Ynez Valley community tolerated the casino and hotel given its three level height restriction and overall size.  However, in **July 2014**, the Band made it public that they intended to drastically increase the size, height and environmental footprint of their operations.  Their July 2014 environmental evaluation ("EE") for their proposed project described a 12 level hotel tower and parking structure as well as a greatly expanded casino to be built 1800 feet from the foot of the Santa Ynez airport runway in direct violation of County of Santa Barbara safety regulations and ordinances.

Additionally, in the same July 2014 EE, the Band proposed either to purchase vast quantities of water from Santa Barbara or they would pump the water out of the Zanja de Cota Creek underflows and alluvial deposits to satisfy the regulatory requirements to have a source of water that would support the new proposed hotel and casino expansion.  The Band claimed they had "*Winters* Rights" to all of the water associated with the Zanja Cota Creek including the stream underflow and alluvial deposits.

SAVE THE VALLEY'S MOTION FOR LEAVE TO FILE COMPLAINT IN INTERVENTION

1   Furthermore, Save the Valley, LLC was engaged in litigation associated with

2   the Bureau of Indian Affairs "Notice of Decision," issued on **December 24, 2014**, to

3   take 1,400 acres in the Santa Ynez Valley into Trust for the Band.  This 1400 acres is

4   part of the original land grant which was also composed of the 75 ¾ parcel at issue in

5   this case.  This "Notice of Decision" compelled Save the Valley, LLC to implement

6   methodical and timely research of the property on which the Band sought to expand

7   their casino and hotel.

8   Thus, Save the Valley, LLC has acted very promptly since the 1906 Judgment

9   became germane to these current events.  Prior to 2014, Save the Valley, LLC did not

10   know of the Judgment and did not know of any violation of its terms.

11   Furthermore, both the United States and the Band claim that Save the Valley

12   cannot sue them in state court or federal court because of sovereign immunity.  By

13   relying on sovereign immunity the Band and the United States have actually required

14   that Save the Valley intervene in this case.  After all, the United States and the Band

15   are <u>already</u> parties to this case; both the Band and the United States submitted to this

16   Court's jurisdiction and Judgment was entered binding them both.  It is now clear

17   after reviewing the historical record that both the Band and the United States have

18   relied upon the Judgment to support their positions, as described in the historical

19   background above.

20   **C.     Save the Valley has a Direct and Immediate Interest in this Action**

21   When evaluating a request to intervene, the question is whether the movant has

22   an "interest" in litigation, not whether the movant has a proper cause of action or

23   permission to sue.  (*Jones v. Prince George's County, Maryland* (D.C. Cir. 2003) 348

24   *F.3d 1014, 1018*.)

25   In *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of*

26   *Engineers* (7th Cir. 1996) 101 F.3d 503, 505, the interests of a citizens group as

27   would-be intervenors in solid waste agency's challenge of denial of permit for

28   proposed landfill was sufficient since they complained that the landfill would be

nuisance.  This fell within bounds of constitutional standing required for environmental cases and, thus, satisfied requirement that their interest was direct, significant, and legally protectable.

Another passage in Solid Waste is particularly important for this case:  "The strongest case for intervention is not where the aspirant for intervention could file an independent suit, but where the intervenor-aspirant has no claim against the defendant yet a legally protected interest that could be impaired by the suit. [citation].  For it is here that intervention may be essential."  (*Id.* at 507.)

Save the Valley has a direct and immediate interest in this action but cannot sue the Band or the United States in another suit.  Save the Valley is a California Limited Liability Company with its principal office in Santa Ynez, California, adjacent to the Property at issue in this case.  Save the Valley is an organization comprised of the Bands' neighbors, adjacent property owners, and users of the Santa Ynez airport which is also adjacent to the Property at issue in this case.  Save the Valley and its constituents are justifiably very concerned with the preservation of Santa Barbara County's beautiful Santa Ynez Valley, including the health, safety, welfare, and environment of all citizens and residents in the valley who are and will be impacted by the construction and expansion of the hotel and associated gambling business in direct violation of Santa Barbara county safety regulaton and ordinances.  Like the concerned citizens in *Solid Waste*, Save the Valley, LLC members and constituents view the hotel and casino expansion, and its associated consumption of vast quantities of water, as a serious public nuisance and safety hazard.

Save the Valley, its members and constituents have a direct and immediate interest in the action because they will suffer injury in fact if the Judgment in the case is not enforced.  The currently favorable property values in the Santa Ynez Valley are derived from the low density, spacious rural settings, prime agricultural industries (e.g., vineyards and livestock) and the equestrian uses of the land.  Adding to the natural beauty and favorable property values is the conspicuous lack of tall buildings

protruding into the skyline.  Property values of the residential and ranch land owned by Save the Valley's members and constituents will decrease if the Band are allowed to violate the terms of the Judgment.  One prime example is seen with the abrupt cancellation of the purchase and sale of a five-acre ranch which was listed at $1,384,000.  (*See* Exhibit S.)  The buyer did not want the property at any price due to the risk of purchasing near the properties.  (*Id.*)

Moreover, of particular interest is the hotel tower and parking structure which is being built 1,846 feet from the end of the runway of the Santa Ynez airport.  (*See* Exhibit T.)  The County of Santa Barbara Land Use and Development Code 35.28.060, Section E 3(b) requires that densely occupied structures like a hotel must not be built closer than one mile, which is 5,280 feet from the end of an airport runway to protect the safety of both the pilots using the airport runway and the occupants of the structure and the surrounding area. (See Exhibit W.) It should be noted that this Google Satellite Photo was captured on 1/5/2015 when the Band were just breaking ground on the construction site for the 12 story hotel/casino expansion project. Since then, the construction of the 12 story tower has progressed substantially and is accelerating. (See Exhibit V.)

Thirdly, Plaintiff, its members and constituents have a direct and immediate interest in the action because this Court can directly address the Band's refusal to honor the Judgment.

**D.     The Intervention will not Enlarge the Issues in this Litigation**

The factual and legal issues in the case have been resolved.  Save the Valley will not enlarge the issues in the case as the issues have been litigated to conclusion. The only issues which will be litigated are: (1) whether the Judgment is valid; (2) if valid, whether the Band have violated the Judgment; and (3) which steps the Court will take to address the past violations and prevent further violations of the Judgment. These issues would be present if, for example, the Catholic Church decided to now enforce the Judgment.  Thus, by intervening Save the Valley will not enlarge or

19

1  amplify the existing or inherent legal or factual issues in the case.

2    **E.**    **The Reasons for the Intervention Outweigh any Opposition by the**

3    **Parties Presently in this Action**

4      The reasons for intervention, i.e., enforcement of the Judgment, are not

5  outweighed by the United States' anticipated opposition.  No doubt, the United States

6  will argue they should not be required to comply with the Judgment because so much

7  time has passed.  However, that is not a valid reason to deny intervention.  In fact, the

8  Judgment was recorded with the Santa Barbara County Recorder's office and runs

9  with the land.  Time does not erode away or dissipate the finality of the Judgment.

10  While many years have passed, the Judgment and the resulting encumbrance on the

11  Property and the restricted use of the waters of Zanja Cota Creek is still valid and in

12  full force and effect.

13  **IV.**    **CONCLUSION**

14      Save the Valley sought intervention within a reasonable time after learning of

15  this case and within a reasonable time of seeking redress outside of this case.  The

16  Court should allow Save the Valley to intervene and deem the attached Complaint in

17  Intervention filed in this case.  The United States and the Band should be allowed 30

18  days to respond to the Complaint in Intervention.

19

20  DATED: November 13, 2015          CHRISTMAN, KELLEY & CLARKE, PC

21

22

23                    By:  /s/ Matthew M. Clarke

24                      Matthew M. Clarke
                      Attorneys for Intervenor SAVE THE
                      VALLEY, LLC

25

26

27

28

SAVE THE VALLEY'S MOTION FOR LEAVE TO FILE COMPLAINT IN INTERVENTION

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF SANTA BARBARA

      I am employed in the County of Santa Barbara, State of California.  I am over the age of 18 years and not a party to this action.  My business address is 1334 Anacapa Street, Santa Barbara, CA 93101.  On November 13, 2015, I served the foregoing document described as: **NOTICE OF MOTION AND MOTION FOR ORDER ALLOWING LEAVE TO FILE COMPLAINT IN INTERVENTION; MEMORANDUM OF POINTS AND AUTHORITIES** on the interested parties in this action:

**SEE ATTACHED SERVICE LIST**

☒     **BY E-MAIL OR ELECTRONIC TRANSMISSION:**  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☒     (Federal)  I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 13, 2015 at Santa Barbara, California.

                    /s/ Matthew N. Mong

1

**SERVICE LIST**

2

3   Eileen M. Decker
    United States Attorney
    Leon W. Weidman
4   Assistant United States Attorney
    Jonathan B. Klink
5   Chief, Civil Division
    Federal Building, Suite 7516
6   300 North Los Angeles Street
    Los Angeles, California 90012
7   Tel.: (213) 894-8561
    Fax: (213) 894-7819

8

9   Richard I Wideman
    Frederick's Court, Suite 232
    485 Alisal Road
10  Sovang, California 93463

11

12  Matthew Benedetto
    Wilmer Hale
13  350 South Grand Avenue, Suite 2100
    Los Angeles, California 90071
14

15

16  Paul Gaspari
    Weintraub, Tobin, Chediak, Coleman &
17  Grodin Law Corporation
    475 Sansome Street, 18th Floor
18  San Francisco, California 94111

19

20

21

22

23

24

25

26

27

28